IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


DAVID MICHAEL DECKER,

                              Case No. 6:13-cv-01415-ST

        Petitioner,

     v.                       FINDINGS AND RECOMMENDATION

ROB PERSSON,

        Respondent.

     Robert W. Rainwater
     Rainwater Law Group
     1430 Willamette Street, Suite 492
     Eugene, Oregon 97401-4049

        Attorney for Petitioner

     Ellen F. Rosenblum, Attorney General
     Samuel A. Kubernick, Assistant Attorney General
     Department of Justice
     1162 Court Street NE
     Salem, Oregon 97310

        Attorneys for Respondent

STEWART, Magistrate Judge:

Petitioner, David Decker, brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his state court convictions for felony murder. For the reasons that follow, the First Amended Petition for Writ of Habeas Corpus (docket #22) should be granted.

**BACKGROUND**

On January 11, 2006, petitioner, Justin Starrett ("Starrett"), and Michelle Wolf ("Wolf") went to the apartment of Kirk Jones ("Jones") where the four consumed a large quantity of vodka and beer. After Wolf left to make a telephone call, Jones began making sexual advances toward Starrett and asked him to spend the night. Trial Transcript, Vol. II, pp. 183, 185, 188. This prompted petitioner to begin teasing Starrett about the overtures, making Starrett angry. *Id* at 188, 193-94. According to petitioner, Jones told them, "Well, if you're going to act like that, you should leave my apartment." *Id* at 288, 279.

At that point, Starrett unscrewed the shade of a nearby lamp, picked up the lamp base with both hands, said to Decker "this is what I think of faggots," and proceeded to hit Jones in the head two or three times. *Id* at 188-89, 280. Petitioner then declared it was "my turn" and proceeded to pick up a half-gallon glass liquor bottle and throw it at Jones's head. *Id* at 137, 181. The bottle bounced off the top of Jones's head, and he began to bleed heavily. *Id* at 137.

Starrett then picked up a knife and began cutting Jones's neck, telling him "this is what happens to faggots." *Id at* 284. Believing that Starrett was going to kill Jones, petitioner left the apartment and waited outside. *Id* at 285-86. When Starrett emerged from Jones's apartment, he informed petitioner that he had killed Jones. *Id* at 286. The two men walked back to the homeless camp where they determined that

they should clean up the crime scene. As a result, they returned to the apartment the next day where they retrieved the lamp, knife, and liquor bottle and disposed of them in a nearby river. *Id* at 184-85.

In the early morning hours of January 12, 2006, Detective Mark Williamson interviewed petitioner. Detective Williamson smelled alcohol on petitioner's breath, and petitioner said that he had been drinking but was comfortable speaking with him. Trial Transcript, Vol. I, p. 14. Petitioner did not seem visibly impaired to Detective Williamson. *Id.* He never became ill, did not do or say anything unusual and was responsive to the questioning. *Id* at 15.

When petitioner began to make inculpatory statements, Detective Williamson tried to read him his *Miranda* warning, but petitioner cut him off and said he already knew them. *Id* at 17. Detective Williamson nevertheless administered the warning before proceeding. After speaking for 15 to 20 minutes, petitioner agreed to provide police with a taped statement and take a polygraph. *Id* at 20-21. As a result, Detective Williamson scheduled a polygraph for 9:00 a.m. the next morning and put petitioner up in a hotel room overnight. *Id* at 21-23.

At 8:00 a.m. the next morning, Detective Williamson picked petitioner up at the hotel still smelling of alcohol. Petitioner admitted drinking that morning, and his blood-alcohol content was .25. *Id* 24-25. Petitioner was given breakfast, and then went to sleep in a room within the police

3 - FINDINGS AND RECOMMENDATION

department for six hours.  *Id* at 61, 74, 75.  When he woke up, he ate another meal took and another blood-alcohol test which yielded a result of .11.  *Id* at 61, 75-76.

The detectives who accompanied petitioner across the department for a polygraph examination did not notice any problems with petitioner's balance or coordination or any visible signs of intoxication.  *Id* at 62, 64, 77.  At approximately 3:30 p.m., authorities again read petitioner his *Miranda* rights and proceeded with a polygraph exam without incident.  *Id* at 61-62.

Two hours later, after being reminded of his *Miranda* rights, petitioner gave a taped statement lasting approximately 30 minutes.  *Id* at 78, 81.  According to petitioner's version of events, Starrett apparently became angry over something Jones said (which petitioner claimed he could not hear), but showed no anger as he unscrewed the finial and lampshade before assaulting Jones with the lamp. Respondent's Exhibit 118, p. 232.  Petitioner told police that Jones was sober enough to appreciate what was happening to him, but made no move to fight back.  "He didn't do anything, he just sat there."  *Id* at 235. Petitioner admitted throwing the bottle that hit Jones in the head, but never actually intended to hit Jones.  Petitioner was unable to explain why he threw the bottle at all and why he threw it in Jones's general direction.  *Id* at 237, 239.  When he hit Jones in the head, Jones moaned in pain and asked why the men were assaulting him.  At this point, petitioner asked Starrett to

stop, but Starrett retrieved a knife from the kitchen and began to cut Jones as petitioner left the apartment. *Id* at 240-41.

On January 20, 2006, petitioner was indicted in Marion County on charges of felony murder, intentional murder, and burglary in the first degree. Respondent's Exhibit 102. The burglary charge stemmed from the theft of the evidence from Jones's apartment the day following the murder. As explained below, the felony murder charge was based on petitioner participating in Starrett's murder of Jones while committing another burglary in the first degree when he remained unlawfully in Jones's apartment with the intent to commit a crime.

Petitioner proceeded to a jury trial where the prosecution introduced his taped statements, and the defense introduced three post-arrest statements from Starrett admitting that he hit Jones in the head with the lamp and stabbed him with a butcher knife. Trial Transcript, Vol. II, pp. 213, 216. The State's medical examiner determined Jones died of blunt force trauma to the head. *Id* at 258. He opined that the knife wound to Jones's neck was superficial and not fatal. *Id* at 266-67. He noted that the injury to the top of Jones's head was consistent with having a bottle thrown at him, but that he did not expect that specific injury was fatal by itself. *Id* at 262, 268. Thus, the jury could infer that Starrett's blows with the lamp were the likely cause of death.

The jury found petitioner guilty of felony murder and burglary in the first degree (based on the theft of evidence), but not guilty of intentional murder. As a result, the court sentenced him to a mandatory life sentence, with a 300-month minimum. Respondent's Exhibit 101.

Petitioner filed a direct appeal alleging that the trial court should not have admitted his statements to the police due to his intoxication. The Oregon Court of Appeals affirmed the trial court's decision without opinion, and the Oregon Supreme Court denied review. *State v. Decker*, 225 Or. App. 376, 201 P.3d 940, *rev. denied*, 346 Or. 116, 205 P.3d 888 (2009).

Petitioner next filed for post-conviction relief ("PCR") in Umatilla County raising a variety of ineffective assistance of counsel claims. The PCR trial court denied relief on all of those claims. Respondent's Exhibit 141. The Oregon Court of Appeals affirmed the PCR trial court's decision without opinion, and the Oregon Supreme Court denied review. *Decker v. Coursey*, 255 Or. App. 511, 298 P.3d 68, *rev. denied*, 353 Or. 714, 303 P.3d 943 (2013).

Petitioner filed this federal habeas corpus case on August 13, 2013. The First Amended Petition alleges that trial counsel was constitutionally ineffective because he:

> 1(A): Not only [f]ailed to object to the admission of co-defendant, Justin Starrett's, statements to the police after his arrest on the ground that the admission of those statements violated his rights to confrontation and cross-examination under

the Sixth Amendment to the United States
Constitution, made applicable to the State
of Oregon by the Fourteenth Amendment to
the United States Constitution, but moved
to admit them as statements against penal
interest.

1(B): Failed to request a jury instruction
on assault as a lesser-included offense of
the felony-murder charge.

1(C): Failed to request a jury instruction
that the jury could only find [petitioner]
guilty of burglary as the predicate felony
for the felony-murder charge in Count One,
if the jury found beyond a reasonable doubt
that either [petitioner] did not have Mr.
Jones's permission to be in his apartment
or that he failed to leave the apartment
after being lawfully directed to do so by
Mr. Jones and that [petitioner] had the
specific intent to commit a felony at the
time he entered or refused to leave.

1(D): Failed to investigate, interview, and
secure the presence of appropriate
witnesses, and failed to present adequate
evidence at trial on the issue of the
voluntariness of [petitioner]'s statements
and/or in support of [petitioner]'s motions
to exclude his post-arrest statements. His
counsel should have called an expert
toxicologist to explain to the Court the
effect that [petitioner]'s degree of
alcohol intoxication had on his ability to
waive his rights in connection with those
post-arrest statements knowingly,
intelligently, and voluntarily. Such expert
should also have testified at the trial to
the effect of the intoxication on the
voluntariness of his statements.

1(E): Failed to investigate, interview, and
secure the presence of appropriate
witnesses at trial, in support of
[petitioner]'s defense that his acts were
not the cause of Mr. Jones's death. Counsel
should have retained an expert pathologist

to contest the State's contention [petitioner]'s acts were a cause of Mr. Jones's death, particularly in light of the ambiguous testimony that the State's expert offered on the subject.

1(F): Failed to argue during the motion for judgment of acquittal or during his final argument to the jury, that the State failed to offer legally sufficient proof that Mr. Jones died during a burglary committed by [petitioner], as a predicate for his conviction for felony murder or to argue that the evidence proved at most [petitioner] was guilty of assault, which could not be the predicate felony for felony murder because [petitioner] did not possess the specific intent to commit a felony (assault) when he entered or remained in Mr. Jones's apartment and because Mr. Jones never revoked [petitioner]'s permission to be in his apartment.

1(G): Failed to inform and properly advise [petitioner] of the plea deal offered by the State and when it was to expire, such that [petitioner] was unable to make a knowing and intelligent choice in deciding whether to accept the plea offer.

1(H): Failed to object to the court's imposition of attorney fees upon [petitioner] without any finding, on the record, of his ability to pay such fees. *See* ORS 151.505(4) and ORS 161.665(4).

As Ground Two, petitioner alleges that he was denied a meaningful appellate review because his appellate attorney was ineffective when she failed to raise: (A) the jury instruction issue in Ground 1(B); (B) the jury instruction issue in Ground 1(C); and (C) the attorney fee issue in Ground 1(H). Ground Three alleges a freestanding claim of actual

innocence, and Ground Four alleges that the cumulative nature of all claims entitles petitioner to habeas corpus relief.

Respondent asks the court to deny relief because: (1) petitioner failed to fairly present most of his claims to Oregon's court, such that those claims are now procedurally defaulted; (2) Ground 1(H) fails to state a cognizable claim; and (3) the state court decision denying relief on the remainder of petitioner's claims was not objectively unreasonable.

**FINDINGS**

## I.   Failure to State a Claim

As Ground 1(H), petitioner argues that his trial attorney should have objected to the court's imposition of attorney's fees without regard to his ability to pay for them.  Pursuant to 28 U.S.C. § 2254, a state prisoner may bring a federal habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Because petitioner's claim pertaining to the imposition of attorney's fees does not challenge the legality of his underlying conviction or resulting sentence, it should be dismissed for failure to state a claim.

## II.   Exhaustion and Procedural Default

### A.   Standards

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims.  *Rose v.*

*Lundy*, 455 U.S. 509, 519 (1982).   "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'"   *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)).   If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, then the claims have not been fairly presented to the state courts and are not eligible for federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule or failed to raise the claim at the state level at all. *Edwards*, 529 U.S. at 451; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).   If a petitioner has procedurally defaulted a claim in state court, then a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or makes a colorable showing of actual innocence. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Sawyer v. Whitley*, 505 U.S. 333, 337 (1992); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

///

10 - FINDINGS AND RECOMMENDATION

**B.    Ground One Claims**

Respondent asserts that petitioner failed to fairly present Grounds 1(A), 1(C), 1(E), and 1(F) to the state courts. Petitioner concedes he failed to present Grounds 1(A), 1(C), and 1(F) at any stage of his PCR proceedings. A review of the record reveals that petitioner also failed to raise his Ground 1(E) claim during his PCR appeal in either of his Appellant's Briefs. Respondent's Exhibits 142 & 143. Because petitioner can no longer present these claims to Oregon's courts for consideration, they are procedurally defaulted.

Petitioner argues that the court should excuse his default as to Grounds 1(A), 1(C), and 1(F) because the performance by his PCR trial counsel fell below an objective standard of reasonableness by failing to fairly present his claims. Traditionally, the performance of PCR counsel could not be used to establish cause and prejudice to excuse a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) (only the constitutionally ineffective assistance of trial counsel constitutes cause); *Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (there is no constitutional right to counsel in a PCR proceeding). However, in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court found "it . . . necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Id* at 1315. It held that "[i]nadequate assistance

of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* Specifically, it instructed as follows:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of trial counsel if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id* at 1320.

Oregon law requires that claims of ineffective assistance of trial counsel must be raised in the initial PCR proceeding. *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (citing *State v. Robinson*, 25 Or. App. 675, 550 P.2d 758 (1976)). Therefore, ineffective PCR counsel may excuse petitioner's procedural default of a substantial claim of ineffective assistance of trial counsel.

### 1.   Ground 1(A): Starrett's Statements

Petitioner claims that that trial counsel was constitutionally ineffective by failing to exclude Starrett's pre-trial statements to police officers under the Sixth Amendment's Confrontation Clause and that PCR trial counsel was ineffective by failing to raise this claim.

In order to prevail on a claim of ineffective assistance of counsel, petitioner must first show that his counsel's

performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689. A petitioner must also show that counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696.

Petitioner believes that the admission of Starrett's statements did nothing to support his case and introduced a variety of prejudicial statements to the jury that: (1) petitioner said Jones deserved to die because he had AIDS and was hitting on Starrett; (2) petitioner made fun of the sound of the bottle bouncing off of Jones's head; (3) petitioner instigated the attack by teasing Starrett about having sex with Jones; (4) just before petitioner threw the bottle at Jones's head, he said "my turn;" (5) petitioner threw the liquor bottle at Jones's head with sufficient force that it landed ten feet away after striking Jones; (6) petitioner wiped fingerprints from Jones's apartment door as he and Starrett were leaving; (7) after the killing, petitioner stated that Jones was swimming with the fishes;

(8) petitioner advocated returning to Jones's apartment after the killing to retrieve the incriminating evidence, including the liquor bottle; and (9) petitioner had an implied criminal history.

Trial counsel gave the following reasons to introduce these statements:

> 5.  We wanted Mr. Starrett's statements to the police heard by the jury because Mr. Starrett admitted to hitting Mr. Jones a number of times with the lamp. Those hits were what actually killed Mr. Jones. [petitioner]'s "involvement" was after the blows from the lamp when he threw the bottle at Mr. Jones.
>
> 6.  The defense always was that [petitioner] did not participate in the killing of Mr. Jones. He had nothing to do with what Mr. Starrett did.
>
> 7.  The statements by Mr. Starrett were needed for this defense. It would have been nice if the throwing of the bottle could have been excluded but it was part of Mr. Starrett's statements and could not be excised.

Respondent's Supplemental Exhibit 153.

Only Starrett and petitioner knew what happened at Jones's apartment on the day of Jones's death. Petitioner's own testimony that Starrett struck the fatal blows, by itself, would have been seen as self-serving and not particularly reliable. While Dennis Flack also testified about the events leading to Jones's death, his account came directly from

14 - FINDINGS AND RECOMMENDATION

petitioner alone.  As a result, without Starrett's statements
that he had been the one to swing the lamp and inflict the
injuries that killed Jones, the jury may have simply found
petitioner to not be credible and guilty of intentional
murder.

        As a result, the court concludes that trial counsel made
a reasonable strategic decision to introduce Starrett's
statements, even though they painted petitioner in an
unflattering light.  For these reasons, petitioner's Ground
1(A) claim is not substantial and cannot excuse his procedural
default.

### 2.    Grounds 1(C) and 1(F): Failure to Argue Intent

        Petitioner raises two somewhat related claims predicated
on his assertion that he did not commit a felony murder during
the course of a burglary.  As Ground 1(C), petitioner alleges
that trial counsel failed to request a jury instruction that
he could only be found guilty of felony murder if he had no
permission to either enter or remain in Jones's apartment and
if he had the specific intent to commit a felony at the time
he entered or refused to leave the apartment.  As Ground 1(F),
petitioner asserts that his trial attorney failed to argue
during a motion for judgment of acquittal or during closing
argument that the State failed to offer legally sufficient
proof that Jones died during the course of a burglary, such
that he could not be convicted of the felony murder charge.

        An understanding of Oregon law is critical to the
resolution of both procedural default issues under *Martinez*

and the merits of these claims.  In Oregon, a person is guilty of felony murder if, in the course of committing burglary in the first degree, a person or participant causes the death of another person.  ORS 163.115(1)(b)(C).  A person is guilty of burglary in the first degree if he "violates ORS 164.215 *and* the building is a dwelling." ORS 164.225(1) (emphasis added). Under ORS 164.215, a person is guilty of burglary in the second degree if he "enters *or* remains unlawfully in a building with intent to commit a crime therein."  ORS 164.215(1) (emphasis added).  The Oregon Court of Appeals has explained that remaining unlawfully is equivalent to "failing to leave after authorization to be present expires or is revoked." *In Re JNS*, 258 Or. App. 310, 318, 308 P.3d 1112, 1117 (2013).  The court was careful to explain that whether entering unlawfully or remaining unlawfully after a lawful entry, "burglary requires criminal trespass *for the purpose of committing a crime.*  Thus, the proper focus is on the defendant's intent **at the initiation of the trespass**." *Id* at 318-19, 308 P.3d at 1117-18 (italics in original) (bold added).

Petitioner did not unlawfully enter Jones's apartment because he was invited in.  Instead, he can only be guilty of burglary under Oregon law if he "remain[ed] unlawfully" in Jones's apartment for the purpose of committing a crime. Thus, the inquiry is whether petitioner had the intent to

assault Jones at the moment Jones asked his guests to leave his apartment.[1]  There was no such evidence in this case.

Trial counsel recognized and argued that Starrett's assault on Jones took petitioner by surprise.  He elicited testimony from the State's evidence technician that there was no evidence showing that petitioner knew Starrett was going to hit Jones.  Trial Transcript, Vol. II, p. 51.  During closing argument, he told the jury, "I don't recall that anybody that testified said there was any evidence of any planning.  In fact, my recollection was they all said there was no evidence of any planning to even assault or hurt Mr. Jones, much less kill him."  Trial Transcript, Vol. III, p. 193.  He emphasized that "the evidence is pretty clear that Mr. Starrett is the person who hit Mr. Jones and it's out of the blue."  *Id* at 194.  At worst, petitioner sat idly by while Starrett began the assault.  Trial counsel did not make any legal argument that petitioner's trespass lacked the contemporaneous intent to commit a crime as required under Oregon law to render him guilty of burglary and, thus, felony murder.  He did not ask the court for an instruction that in order to convict petitioner of felony murder, the jury would have to find that at the very moment Jones asked them to leave his apartment, petitioner already had formed the intent to assault him.

---

[1] It is clear from the record that Jones asked both petitioner and Starrett to leave his apartment as tensions escalated. In addition to Jones's own statements (Trial Transcript, Vol. II, pp. 228, 279), Starrett stated that Jones "had told them both to leave just prior to when he was struck." *Id* at 189.

Similarly, trial counsel did not make this argument in his motion for judgment of acquittal at the close of the State's case or in his closing argument to the jury.

For guidance on Oregon's interpretation of burglary in the context of an unlawful remaining, the State argues that the court should not rely on *In Re JNS* because it was decided approximately seven years after petitioner's trial, and should instead look to *State v. Felt*, 108 Or. App. 730, 816 P.2d 1213 (1991). But *In Re JNS* did not purport to change Oregon law in any way. It merely applied existing law. Even if the court were limited to the *Felt* decision in its assessment of petitioner's claims, the result would be the same.

The Oregon Court of Appeals summarized the facts in *Felt* as follows:

> Defendant and the victim, Laura Stewart, lived together for six months. Stewart then moved out, but continued seeing defendant on a social basis. One evening, they went out for dinner and drinks. Afterward, defendant drove Stewart home. He dropped her off at her house and she went inside, alone. As she began getting ready for bed, defendant knocked on the door and asked to use the phone. Stewart let him in, pointed to the phone, returned to her bedroom and closed the bedroom door. After Stewart was in her nightclothes, defendant walked into her room without knocking and asked for a hug. Stewart hugged him. Defendant then asked for a kiss. Stewart said no. Defendant kissed her anyway and she pushed him away. He began hitting, slapping and yelling at her. He knocked her down, threw her on the bed, threatened her with a pair of scissors and forced her to have sexual intercourse with

> him.   Eventually, defendant got dressed,
> walked into the living room, ripped the
> phone out of the wall, rummaged through
> Stewart's purse and left.  Stewart dressed
> and went to a telephone booth outside her
> apartment.  Defendant reappeared, entered
> the booth and began hitting her.  When she
> started bleeding, he ran away.

*Felt*, 108 Or. App. at 732, 816 P2d at 1213.

Petitioner was ultimately charged with committing first degree burglary.  He moved for a judgment of acquittal on the basis that the State offered no evidence that the defendant had revoked her permission for him to be on the premises where she never asked or told him to leave.  The trial court denied the motion, and petitioner appealed.   The Oregon Court of Appeals concluded that:

> defendant was privileged to enter and remain in
> Stewart's home to use the phone and to hug her,
> because she consented to those acts.  However, a
> reasonable jury could have found that, from the
> point at which Stewart refused defendant's
> request for further intimacy, defendant was no
> longer acting within the limits of the consent
> given.  Additionally, the circumstances of this
> case would support the inference that, when
> Stewart reacted against defendant, she impliedly
> revoked her permission that he remain on the
> premises.

*Id* at 733, 816 P2d at 1214.

The State argues that the facts in this case, much like those in *Felt*, show that Jones impliedly revoked petitioner's permission to be in his apartment at the same moment petitioner assaulted him.  However, the unlawful remaining began earlier when Jones asked the men to leave.  There is no evidence in the record that petitioner developed an intent to

assault Jones until *after* Starrett initiated the assault. Because he had already passed the point of remaining unlawfully in the apartment prior to forming this intent, there could be no burglary under Oregon law. And unlike *Felt* where it was apparent the defendant had the intent to assault Stewart from the moment she allowed him in under the obvious pretense of using the phone, there was no indication in petitioner's case that he went to or remained in Jones's apartment in order to assault him. Accordingly, petitioner could not have been guilty of burglary and, by extension, felony murder.

Trial counsel should have made the intent issue the centerpiece of his sufficiency of the evidence argument during the motion for judgment of acquittal, as well as his closing argument. In addition, he should have requested a specific jury instruction that would have allowed the jury to assess whether petitioner formed the requisite intent to assault Jones at the very moment Jones asked the men to leave his apartment. Had he done so, it is likely petitioner would not have been convicted of felony murder. Because trial counsel did not do so, the jury was left to conclude that petitioner was guilty of felony murder if at any time after the unlawful remaining, he formed the intent to assault Jones (which he obviously did).

The court not only finds that petitioner's claims in Grounds 1(C) and 1(F) amount to substantial claims sufficient to excuse petitioner's procedural default under *Martinez*, but

upon a *de novo* review of the claims, recommends that the court grant habeas corpus relief on them. *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (where a petitioner excuses a default under *Martinez*, the appropriate standard of review is *de novo*).

### 3.    Grounds 2(A), 2(B), and 2(C)

Petitioner alleges that his attorney on his direct appeal was constitutionally ineffective by failing to raise claims pertaining to the trial court's jury instructions and imposition of attorney's fees. Petitioner concedes that these claims are procedurally defaulted, but seeks to excuse the default pursuant to *Martinez*.

In the Ninth Circuit, the *Martinez* exception to procedural default applies not only to a PCR trial attorney's failure to raise claims of ineffective assistance of trial counsel, but also to any failure to raise claims of ineffective assistance by direct appellate counsel. *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013).[2] However, it is uncontroverted that these claims were not preserved during his criminal trial as required by Oregon law. Petitioner had a preserved issue concerning his statements made to law enforcement officials while he smelled of alcohol and displayed varying levels of intoxication. This was a reasonably strong claim, and is precisely the issue appellate counsel opted to raise. It was reasonable appellate strategy

---

[2] Respondent argues that *Nguyen* is wrongly decided, but concedes that this court must follow *Nguyen*.

for counsel to focus on that claim to the exclusion of unpreserved issues. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (appellate attorney "who files a merits brief need not (and should not) raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). Because appellate counsel's performance did not fall below an objective standard of reasonableness, *Martinez* does not provide petitioner with a basis to excuse his default as to Grounds 2(A), 2(B), and 2(C).

## III. <u>Merits of Remaining Claims</u>

Following the foregoing analysis, Grounds 1(B), 1(D), 1(G), 3, and 4 remain for consideration on their merits.

### A.    <u>Standard of Review</u>

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that

contradicts the governing law set forth in [the Supreme
Court's] cases" or "if the state court confronts a set of
facts that are materially indistinguishable from a decision of
[the Supreme] Court and nevertheless arrives at a result
different from [that] precedent." *Williams v. Taylor*, 529
U.S. 362, 405-06 (2000). Under the "unreasonable application"
clause, a federal habeas court may grant relief "if the state
court identifies the correct governing legal principle from
[the Supreme Court's] decisions but unreasonably applies that
principle to the facts of the prisoner's case." *Id* at 413.
The "unreasonable application" clause requires the state court
decision to be more than incorrect or erroneous. *Id* at 410.
The state court's application of clearly established law must
be objectively unreasonable. *Id* at 409.

   B.   **Analysis**

       1.   **Ground 1(B): Jury Instruction on Assault**

   As Ground 1(B), petitioner alleges that his trial counsel
was ineffective by failing to request a jury instruction on
assault as a lesser-included offense of felony murder.   He
asserts that without a lesser-included instruction on assault,
the jury only had the option of either finding him guilty or
acquitting him of felony murder.[3]   Trial counsel submitted an

---

[3] Although petitioner also contends that he was innocent of
felony murder because Jones never revoked his permission for
petitioner to be in the apartment, Jones asked both petitioner
and Starrett to leave his apartment as tensions escalated, as
discussed above.

affidavit during the PCR trial explaining his rationale for
not seeking an assault instruction:

> 3. *Re: failure to request lesser included
>    offense (LIO) jury instructions.* The
>    prosecutor's theory was that
>    Petitioner committed felony murder
>    when, in the course of a burglary, the
>    victim (Kirk Jones) was killed. The
>    prosecution argued that Petitioner had
>    committed the crime of burglary when
>    he remained at Jones's residence
>    despite Jones's request that
>    Petitioner (and his co-defendant,
>    Justin Starrett) leave, and
>    subsequently assaulted Jones.
>    Petitioner's position, throughout my
>    representation of him, was that he did
>    not aid, assist or help in any way to
>    cause the death of Mr. Jones.
>    Accordingly, there were no LIO
>    instructions that would have been
>    appropriate.
>
> 4. My decision not to request LIO
>    instruction was also strategic. In my
>    professional experience, juries
>    respond negatively to the argument,
>    "My client is not guilty. But if he
>    is, please find him guilty of a lesser
>    offense."

Respondent's Exhibit 122, p. 2.

The PCR trial court found that trial counsel's decision
was strategically sound based on his belief that the jury
would disfavor an alternative argument of culpability, adding:
"I don't think there is a lesser included of the felony
murder." Respondent's Exhibit 140, p. 28.

Petitioner contends that the PCR trial court misstated
the law because, as the State represented during the PCR

proceedings, assault in the fourth degree is a lesser-included offense of felony murder as applied to this case. *See* Respondent's Exhibit 120, p. 11. He therefore asks the court to refuse to apply the Anti-terrorism and Effective Death Penalty Act's ("AEDPA") standard of review to this claim. While the PCR trial court was unsure what lesser included offenses fall under felony murder, it did not reject petitioner's claim on this basis. Instead, its decision was based on the reasonableness of trial counsel's decision that alternative theories of culpability might alienate the jury. Accordingly, the court should apply AEDPA's standard of review to this claim.

Even applying the required level of deference to the PCR trial court's decision as required by the AEDPA, trial counsel's performance fell below an objective standard of reasonableness by failing to request a lesser-included instruction on assault in the fourth degree. As discussed above, trial counsel did not realize that petitioner could not be found guilty of burglary and, hence, felony murder under Oregon law given the facts of this case. Where petitioner was not guilty of these crimes, trial counsel was obligated to ask the court to issue a lesser-included instruction on assault. By failing to do so, he placed the jury in the position of finding that petitioner's assault on Jones either amounted to felony murder or non-criminal conduct. Had he explained the intent element of burglary as it pertains to an unlawful remaining and had he given the jury a chance to convict

petitioner of assault, there is a reasonable probability that the jury would have convicted him of the lesser offense. Accordingly, the court should grant relief on this claim.

### 2. **Ground 1(D): Voluntariness of Statements to Police**

Petitioner next alleges that his trial counsel was ineffective for failing to hire an expert toxicologist to explain the effect of his intoxication on his ability to waive his *Miranda* rights and provide post-arrest statements to police in a knowing, intelligent, and voluntary manner. Where the three interviewing police officers presented substantial evidence of his intoxication, he asserts that it was not a reasonable tactical decision to forego hiring a toxicologist for the defense.

At the PCR trial, petitioner introduced an expert affidavit from Dr. Jerry Larsen who diagnosed him with Attention Deficit Disorder and concluded:

> At the time of the alleged [crime], it certainly appears that [petitioner] was intoxicated.
>
> * * *
>
> [Petitioner]'s description of his condition at the time of the altercation might be described as near stuporous. If we assume that the blood alcohol reported is correct, then at the time of the police interviews he remained intoxicated with the deficiencies described above, both from alcohol and his attention deficit disorder. With reasonable medical certainty, given the above assumptions, at the time of the alleged [crime] he was suffering from both

mental disease and intoxication which altered his judgement, cognition. This also appears to be true at the time of the questioning by the police. It would be interesting to see the actual polygraph results to see if in[] fact his responses were disorganized, a finding that may be consistent with attention deficit disorder and intoxication.

Respondent's Exhibit 112, pp. 7-8.

In his affidavit, trial counsel explained why he did not retain a toxicologist:

> 5.    The police in this case did a good job of dealing with Petitioner's alcoholism. When it was clear that he was under the influence, they let him sleep it off. When he was in a fully coherent state, Petitioner made a number of admissions that placed him at the scene of the crime, assisting co-defendant Starrett. Unfortunately, after the co-defendant started beating up the victim, Petitioner had thrown a vodka bottle that hit him on the head. As a result of his involvement, Petitioner was convicted of felony murder.

> 6.    *Re: failure to hire expert on alcoholism/voluntariness of confession.* There was no need to hire an expert on alcoholism/voluntariness of confessions to testify at the trial, because the voluntariness of Petitioner's statements to the police

> had already been litigated, pre-trial,
> through the State's motion to admit
> three separate statements that
> Petitioner had made.    It is my
> understanding that Petitioner appealed
> the trial court decision to grant the
> State's motion to admit those
> statements, and the Oregon Court of
> Appeals affirmed without opinion.

Respondent's Exhibit 122, p. 2.

Rejecting petitioner's claim, the PCR trial court found that: (1) the trial court found his statements to be voluntary based on all of the facts; and (2) an expert witness would not have been helpful.  Respondent's Exhibit 141, p. 1.

Trial counsel made his own determination that the police had acted appropriately and taken precautions against obtaining statements that petitioner was not able to voluntarily provide.  In light of the record, this was a reasonable determination.

In addition, the affidavit from Dr. Larson at the PCR trial was equivocal as to whether petitioner's alcohol consumption actually affected his statements to police.  Thus, it did not constitute strong evidence.

For all of these reasons, the PCR trial court's determination that trial counsel was not ineffective for failing to hire an expert toxicologist is neither contrary to, nor an unreasonable application of, clearly established federal law.

///

///

### 3.    Ground 1(G): Advice Regarding Plea Offer

The State offered petitioner a plea agreement of 188-
months if he agreed to plead guilty to Manslaughter in the
First Degree and Burglary in the First Degree.  Petitioner's
Exhibit 123.  The offer was intended to result in a global
resolution, such that if either defendant rejected his offer,
then both offers expired.[4]  *Id*.  Petitioner alleges that trial
counsel was ineffective by failing to inform and properly
advise him regarding this plea offer.  He maintains that this
failure prevented him from making a knowing and intelligent
decision as to whether to accept the plea offer.

The *Strickland* test applies to claims that a petitioner
did not receive effective assistance in determining whether to
accept a guilty plea.  *Hill v. Lockhart*, 474 U.S. 52 (1985).
Where a petitioner has pled guilty, he demonstrates prejudice
if he shows that there is a reasonable probability that, but
for counsel's errors, he would not have entered such a plea
and would have insisted on going to trial.  *Id* at 59.
Accordingly, in this case where petitioner claims he was
misled into passing on a plea offer, he demonstrates prejudice
if he shows that, but for counsel's erroneous advice, he would
have insisted on entering a guilty plea.

In his affidavit, trial counsel explained:

> Petitioner    consistently    maintained    the
> position that he would not plead guilty to

---

[4]    Starrett's plea offer was a life sentence with a
mandatory 25-year sentence.  Respondent's Exhibit 123.

> *anything*, because it was his belief that he
> hadn't aided or participated in any manner.
> Therefore, he rejected the State's 188-
> month offer, which was dependent upon both
> Petitioner and his co-defendant's
> acceptance.

Respondent's Exhibit 122, p. 3 (italics in original).

At the PCR trial, petitioner testified that his trial counsel instructed him not to take any offer the State made and "to wait until the very last moment to get the best deal possible." Respondent's Exhibit 140, p. 11. He claimed that trial counsel never showed him any offer in writing, and he disagreed with trial counsel's characterization that he refused to enter a guilty plea of any kind. *Id* at 12. At the conclusion of the PCR trial, the PCR trial court made the following findings:

> I find insufficient evidence that
> Petitioner wanted to accept the offer of
> 188 months. Also, one of the other things
> about that offer, it was an all or nothing
> offer. Both co-defendants had to take it,
> or there was no 188 months.
>
> And there is absolutely no evidence the co-
> defendant had agreed to take that offer.
> So that would have thrown the offer out in
> any event. And I find nothing that says
> that the Petitioner was willing to take 188
> months.

Respondent's Exhibit 140, p. 28.

Petitioner contends that the record contains only evidence that he was interested in the plea offer. However, trial counsel's affidavit clearly constitutes evidence that petitioner was not interested in any plea offer. While

30 - FINDINGS AND RECOMMENDATION

petitioner rejected this notion in conclusory fashion during his PCR trial (*id*, p. 12), he never testified that he would have taken the plea had he been properly advised. Furthermore, petitioner presented no evidence that Starrett was inclined to accept the State's offer of a life sentence with a 25-year minimum, a prerequisite to petitioner's eligibility for the 188-month plea deal. Accordingly, the PCR trial court's decision denying relief on this claim is neither contrary to, nor an unreasonable application of, clearly established federal law.

### 4.  <u>Ground 3: Actual Innocence</u>

Petitioner believes that because insufficient evidence of his guilt was adduced at trial, he is actually innocent of felony murder. In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." In *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court again declined to decide whether a capital petitioner may assert a freestanding actual innocence claim. It did, however, state that the threshold for such a claim is "extraordinarily high" and exceeded that of a "gateway" showing of actual innocence to excuse a procedural default under *Schlup v. Delo*, 513 U.S. 298 (1995). *Id* at 555. To prevail on a freestanding innocence claim, a petitioner "must go beyond demonstrating

doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (*en banc*). Such claims are only successful where "new facts unquestionably establish [a petitioner's] innocence." *Id* at 478 (citing *Schlup*, 513 U.S. at 317).

Petitioner presents no new evidence of his innocence and instead relies on the existing record to establish that the evidence was insufficient to convict him of felony murder. Therefore, his *Herrera* claim lacks merit.

### 5.   Ground 4: Cumulative Error

As his final claim, petitioner alleges that the cumulative errors detailed in his Grounds for Relief warrant a finding of prejudice. Because the court recommends granting habeas relief as to Grounds 1(C) and 1(F) of petitioner's claims, it need not reach the cumulative error argument.

## IV.   Alternative Request for Evidentiary Hearing

Petitioner asserts that if the court does not grant relief on his Petition on the existing record, it should conduct an evidentiary hearing in order to receive his testimony as well as testimony from his attorneys and any other witnesses who might be beneficial to his case. The court should grant relief on the existing record and decline to hold an evidentiary hearing.

///

///

///

///

**RECOMMENDATION**

For the reasons identified above, the court should deny petitioner's request for an evidentiary hearing, but grant relief on the First Amended Petition for Writ of Habeas Corpus (docket #22). Accordingly, the court should require respondent within 90 days to recalculate petitioner's sentence without the felony murder conviction and, if appropriate under the resulting calculation, either release him from custody or provide him with a new trial with the assistance of constitutionally effective counsel.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due August 17, 2015. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th of July, 2015.

s/ Janice M. Stewart

_____
          Janice M. Stewart
          United States Magistrate Judge

33 - FINDINGS AND RECOMMENDATION